## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

SEMPITERNO IN MOTION, LLC                     CIVIL ACTION

VERSUS                                          No. 20-681

CAJUN 417, LLC                                 SECTION I

## ORDER & REASONS

Before the Court is defendant Cajun 417, LLC's ("Cajun") motion[1] to disqualify Intellectual Property Consulting, LLC ("Intellectual Property") from serving as counsel to plaintiff Sempiterno In Motion, LLC ("Sempiterno") because of an alleged conflict of interest.[2]  Sempiterno opposes the motion.[3]

Also before the Court is Cajun's motion[4] to continue the submission date of Sempiterno's motion for a preliminary injunction; a joint motion[5] to expedite consideration of said motion to continue; and Sempiterno's motion[6] for an extension of time to respond to Cajun's answer and counterclaims.  For the following reasons, Cajun's motion to disqualify is denied; Cajun's motion to continue the submission date of the preliminary injunction motion and the joint motion to expedite consideration of the motion to continue are dismissed as moot; and Sempiterno's motion for an extension of time to answer is granted.

---

[1] R. Doc. No. 16.
[2] *Id*. at 2.
[3] R. Doc. No. 23.
[4] R. Doc. No. 18.
[5] R. Doc. No. 20.
[6] R. Doc. No. 32.

## I.

This case arises from a trademark dispute over use of the word mark and logo, "HOUSE OF THE RISING SUN."[7]  In its complaint, Sempitero states that it is the owner of  two federal trademark registrations incorporating the term "HOUSE OF THE RISING SUN."[8]  Sempiterno claims to have spent, since 2016, "significant sums of time, money, and effort in building and bringing to fruition a successful business in New Orleans, Louisiana centering on the HOUSE OF THE RISING SUN marks."[9]

Sempiterno states that it learned earlier this year that Cajun, in violation of these trademarks, operates a bar and restaurant named "The House of the Rising Sun," where similarly branded merchandise also is sold.[10]  Despite what Sempiterno asserts were repeated requests, Cajun "refused to cease its infringing conduct."[11]

Consequently, on February 27, 2020, Sempiterno filed a complaint with the Court[12] and, on May 18, 2020, filed an amended complaint.[13]  Sempiterno alleges that (1) it owns the HOUSE OF THE RISING SUN marks and that they are protectable; (2) that it is the senior user of the HOUSE OF THE RISING SUN marks; and (3) that Cajun's use of the "House of the Rising Sun" mark will result in a likelihood of

---

[7] *See generally* R. Doc. No. 9.
[8] *Id*. at 4 ¶ 15; R. Doc. No. 13-1, at 3; R. Doc. No. 23, at 3.
[9] R. Doc. No. 23, at 3.
[10] *Id*. at 3–4; R. Doc. No. 9, at 5–7 ¶¶ 19–26.
[11] R. Doc. 9, at 7 ¶ 29.
[12] *See* R. Doc. No. 1.
[13] *See* R. Doc. No. 9.

confusion.[14]  Sempiterno seeks various declaratory judgments from the Court as well as monetary awards.[15]  The day cannot yet dawn on the primary claims, however, because on July 11, 2020, Cajun filed the instant motion to disqualify Intellectual Property from serving as counsel for plaintiff, and the Court continued without date all pending motions until the disqualification motion was resolved.[16]

## A.  Background

The House of the Rising Sun, located at 417 Bourbon Street in New Orleans, Louisiana, is one of five New Orleans-area bars and restaurants wholly owned by the Bader family and primarily managed and represented by Morton Bader ("Bader").[17]  The family's first restaurant, Oceana Grill, opened in 2003.[18]  After "several years" of operating Oceana Grill, the Bader family decided to expand its business.[19]

In October 2012,[20] as the Baders built out their family of brands, they engaged the intellectual property attorney Mark Melasky ("Melasky"), who then worked with

---

[14] *Id.* at 3–8 ¶¶ 12–33.

[15] *See id.* at 16–18 ¶ A–N.

[16] R. Doc. No. 21.  *See Sumpter v. Hungerford*, No. 12-717, 2013 WL 2181296, at *3 (E.D. La. May 20, 2013) (Morgan, J.) (noting that where other motions were pending in a case, a "motion to disqualify must still be resolved first in the interest of fairness and judicial economy").

[17] R. Doc. No. 16-1, at 5.  The other establishments are Oceana Grill, operated by Cajun Conti, LLC; Bobby Hebert's Cajun Cannon, operated by Cajun Vets, L.L.C.; Mambo's, operated by Cajun House, L.L.C.; and Olde N'Awlins Cookery, operated by Cajun Bourbon, LLC.  *Id.*

[18] *Id.* at 3; R. Doc. No. 16-2, at 2 ¶ 7.

[19] R. Doc. No. 16-2, at 2 ¶ 8.

[20] R. Doc. No. 16-1, at 13.

the law firm Koeppel Traylor, LLC.[21]  Melasky states that he was retained by Bader "to provide trademark-related legal services for [Bader's] company Cajun Bourbon, LLC."[22]  Melasky and Bader agree that Melaksy initially represented Cajun Bourbon, LLC in negotiations with Emeril's New Orleans restaurant group regarding Cajun Bourbon, LLC's use of Olde NOLA's Cookery as the name of its restaurant on Bourbon Street.[23]

The next month, November 2012, Bader and Melasky exchanged emails, copies of which Cajun appended to their motion to disqualify.[24]  Bader informed Melasky on November 18 that a "retainer check" would be dropped off "tomorrow," and the next day, Melasky replied to set a time to meet Bader at Oceana Grill and to "talk about a strategy to protect all of the trademarks you are interested in and to focus on how you want to brand your restaurants."[25]

Thereafter, according to Bader, Melasky "advise[d] [the Bader family] on the intellectual property of [the family's] expansion efforts" and worked with Bader on strategy and branding "for several bars and restaurants."[26]  Bader asserts that he spoke with Melasky about the family's plans to develop new restaurants using the names Olde N'Awlins Cookery, Satchmo's, Petunia's, and House of the Rising Sun.[27] As to the last, Bader states: "I disclosed my family's business plans to Mr. Melasky,

---

[21] *Id.* at 3.
[22] R. Doc. No. 23-1, at 3 ¶ 4.
[23] *Id.* at 3 ¶ 7; R. Doc. No. 16-2, at 2 ¶ 13.
[24] *See* R. Doc. No. 16-2, at 1.
[25] R. Doc. No. 16-3, at 1.
[26] R. Doc. No. 16-2, at 2 ¶¶ 9–11.
[27] *Id.* at 2 ¶ 12.

including our plans for the House of the Rising Sun, and he knew or should have known the value that my family placed on its branding, including the House of the Rising Sun."[28]

Bader stated that Melasky also "advised the Bader family regarding trademark issues when we were engaged in intellectual property contract negotiations to acquire the rights to use the 'Bobby Herbert's Cajun Cannon' brand" for a bar and restaurant.[29]  Bader and his family also turned to Melasky for "advice on our ideas," such as the potential restaurant or bar name, "Off the Chain," about which they exchanged emails.[30]  In sum, according to Bader, Melasky "was a trusted adviser" to the Bader family.[31]  The scope of Melasky's engagement by the Bader family, Bader maintains, was jointly "understood" to be "broad."[32]

"For the most part," Melasky agrees with Bader's testimony about Melasky's representation of the Bader family's businesses.[33]  Specifically, Melasky agrees that Bader consulted him about the use "or intended use" of the trademarks Oceana Grill, Olde N'Awlins Cookery, Petunia's, Satchmo's, and Off the Chain.  Melasky also engaged in licensing negotiations for a company owned by Bader to use the mark "Bobby Hebert's Cajun Cannon."[34]  Indeed, between March and September 2013, Melasky filed trademark or service mark applications with the United States Patent

---

[28] *Id.* at 3 ¶ 17.
[29] *Id.* at 3 ¶ 19.
[30] *Id.* at 3 ¶ 18.
[31] R. Doc. No. 16-1, at 4.
[32] R. Doc. No. 16-2, at 2 ¶ 11.
[33] R. Doc. No 23, at 6.
[34] R. Doc. No. 23-1, at 3 ¶ 5.

and Trademark Office ("USPTO") for Petunia, Olde N'Awlins Cookery, Satchmo, and twice for Oceana, in connection with companies owned by the Baders.[35]

However, aside from the use of or the intent to use the trademarks Oceana Grill, Olde N'Awlins Cookery, Petunia's, Satchmo's, Off the Chain, and Bobby Hebert's Cajun Cannon, Melaksy states that he has "no recollection of, nor have I found any documentary evidence of, Mr. Bader or any of his family members sharing with me any specific business, expansion, or branding plans. . . ."[36]  In particular, Melasky maintains that he "do[es] not recall any consultation with Mr. Bader or any of Mr. Bader's family members regarding use of 'House of the Rising Sun' as a trademark."[37]

---

[35] *See* R. Doc. No. 16-2, at 3 ¶ 14.  Melasky states that on March 18, 2013, he "filed responses to office actions issued by the USPTO in connection with the trademark applications that had previously been filed" by another company owned by Bader, for: (1) an application to register the word mark OCEANA GRILL, Serial No. 85636654, and (2) an application to register the composite mark OCEANA GUMBO STEAKS SEAFOOD POBOYS OYSTER BAR, Serial No. 85636673."  R. Doc. No. 23-1, at 4 ¶ 9.  Melasky states that on April 25, 2013, he filed an application to register the word mark SATCHMO'S GRILL AND RESTAURANT with the USPTO, Serial No. 85914849, on behalf of Cajun Bourbon, LLC.  *Id.* at 3 ¶ 6.  Melasky further states that on April 27, 2013 he filed an application to register the word mark OLDE N'AWLINS COOKERY with the USPTO, Serial No. 85916677 and Registration No. 4458295, on behalf of Cajun Bourbon, LLC.  *Id.* at 3 ¶ 7.  Melasky states that on May 3, 2013 he filed an application to register the word mark PETUNIA'S with the USPTO, Serial No. 85923073, on behalf of Cajun Bourbon, LLC.  R. Doc. No. 23-1, at 3 ¶ 8.  Finally, Melasky states that on September 30, 2013 he filed appeals to the Trademark Trial and Appeal Board ("TTAB") in connection with the application to register the word mark OCEANA GRILL, Serial No. 85636654, and the application to register the composite mark OCEANA GUMBO STEAKS SEAFOOD POBOYS OYSTER BAR, Serial No. 85636673.  *Id.* at 4 ¶ 10.

[36] R. Doc. No. 23-1, at 4 ¶ 14.

[37] *Id.* at 4–5 ¶¶ 14–15.  Melasky stated that he has not located any emails or other documents "that would contradict my recollection."  *Id.* at 5 ¶ 15.

According to Melasky's review of his own records and emails—which Melasky states was his primary mode of communication with Bader—his representation of Bader's companies ended "no later than in February 2014."[38]  Since that time, Melasky states that he has "not provided any legal services of any kind to Mr. Bader, his family members, or any company that he owns."[39]  Several years later, Melasky joined the law firm Intellectual Property.[40]

On March 26, 2019, Cajun was formed.[41]  It is owned and operated by Bader and members of the Bader family.[42]  Neither Melasky nor Intellectual Property has ever served as counsel for Cajun.[43]

Melasky emailed Bader on July 8, 2019, to offer his legal services to file a declaration of use to maintain the registration Melasky had originally helped obtain for the Olde N'Awlins Cookery mark.[44]  According to Melasky, Bader never replied.[45]

In December 2019, Melasky's name appeared in the USPTO's Trademark Status and Document Retrieval System related to the Olde New A'wlins Cookery mark, an automated result of his having made the original filing in April 2013.[46]

---

[38] *Id.* at 4 ¶ 11.

[39] *Id.*; s*ee also* R. Doc. No. 23, at 1.

[40] R. Doc. No. 23, at 1 (stating that Melasky started work at Intellectual Property "several years" after his work with the Bader family businesses).

[41] *Id.* at 1 n.1 (citing information on file with the Louisiana Secretary of State, available at https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=1364995_2B98D4D8CB) (last visited Aug. 21, 2020).

[42] R. Doc. No. 16-2, at 1 ¶ 4.

[43] R. Doc. No. 23-1, at 5 ¶ 17.

[44] *Id.* at 5 ¶ 16.

[45] *Id.*

[46] R. Doc. No. 16-2, at 3 ¶ 20; R. Doc No. 23, at 7 n. 4.

Intellectual Property is counsel for Sempiterno.  Melasky maintains that he "do[es] not personally represent Plaintiff Sempiterno" and that he has "no involvement with the lawsuit" between Sempiterno and Cajun, except for providing a declaration in opposition to Cajun's motion to disqualify.[47]

Cajun states that through their own research, they discovered that Melasky now works for Intellectual Property.[48]  Cajun reports that on June 5, 2020, they called Intellectual Property to inform the firm that it should be disqualified, on the ground that Melasky's previous work on behalf of companies owned by the Bader family presented a conflict of interest that should prohibit Intellectual Property from undertaking representation adverse to Cajun.[49]  Moreover, Bader has not agreed, "and will not agree," to waive the alleged conflict of interest in the litigation between Melasky and Intellectual Property or consent to Intellectual Property's representation of Sempiterno.[50]  Bader further asserts, "based on information and belief," that no member of his family would waive the alleged conflict of interest or consent to the representation.[51]  Because Intellectual Property did not withdraw, Cajun filed this motion to disqualify.[52]

### B. Parties' Arguments

---

[47] R. Doc. No. 23-1.

[48] R. Doc. No. 16-1, at 5.

[49] *Id.*

[50] R. Doc. No. 16-2, at 4 ¶¶ 23, 25.

[51] *Id.* at 4 ¶¶ 24, 26.

[52] R. Doc. No. 16-1, at 5.

Cajun offers five arguments as to why disqualification of Intellectual Property in this matter "is necessary to protect the Bader family and Cajun 417":[53]  (1) while serving as the intellectual property attorney "for Mr. Bader and his family of bars and restaurants," Melasky "was a trusted advisor" and "learned confidential information about [the Baders] and their global business, expansion, and branding plans that are substantially related to the claims in this matter"[54]; (2) Bader and his family shared with Melasky "their intent and strategy to open several bars and restaurants over time, including a bar and restaurant named 'The House of the Rising Sun,'" the name at issue in this case;[55] (3) Melasky has not requested the informed consent of Bader or his family for Intellectual Property's representation of Sempiterno in this matter, and, even if he had, the Baders are unwilling to consent; (4) Melasky's conflict is imputed to Intellectual Property pursuant to Rule 1.10 of the Louisiana Rules of Professional Conduct; and (5) Melasky and Intellectual Property owe duties of loyalty and confidentiality to Cajun and the Bader family that prohibit them from serving as Sempiterno's counsel in this matter.[56]  Consequently, Cajun alleges that Intellectual Property's representation adverse to Cajun is "harmful to Cajun 417. . . ."[57]

Sempiterno counters that Cajun seeks Intellectual Property's disqualification because "one of [the firm's] attorneys, who is not involved in the representation of

---

[53] *Id.* at 2.

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.* at 6.

[Sempiterno] in any way, provided legal services (1) to companies that are not parties to this lawsuit, (2) while he was with another law firm, and (3) more than five years before Cajun 417 came into existence."[58]

## II.

"Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re American Airlines, Inc.,* 972 F.2d 605, 610 (5th Cir.1992). "As such, and because disqualification of an attorney is a harsh and disruptive remedy, the party seeking disqualification bears the burden of proving a conflict of interest requiring disqualification." *Sumpter*, 2013 WL at *5; *see United States v. DeCay,* 406 F.Supp.2d 679, 683 (E.D.La.2005) (citing *F.D.I.C. v. U.S. Fire. Ins. Co.,* 50 F.3d 1304, 1316 (5th Cir.1995)). When faced with a motion to disqualify counsel, the Court must consider the applicable rules of professional conduct and applicable case law to determine if a conflict exists and if disqualification would be an appropriate remedy. This process requires the Court to undertake "painstaking analysis of the facts and precise application of precedent," and precludes painting with a broad brush. *Brennan's, Inc. v. Brennan's Rests., Inc.,* 590 F.2d 168, 173–74 (5th Cir.1979).

First, the Court looks to the "local rules promulgated by the Court itself." *U.S. Fire Ins. Co.,* 50 F.3d at 1312. The Local Rules for the Eastern District of Louisiana (the "Local Rules") incorporate the Rules of Professional Conduct of the Louisiana

---

[58] R. Doc. No. 23, at 1–2.

State Bar (the "Louisiana Rules").  *See* LR 83.2.3.   In determining whether an attorney-client relationship exists, federal courts look to state law.  *See, e.g., American Airlines,* 972 F.2d at 614–15 (applying Texas law); *Sumpter*, 2013 WL at *7 (applying Louisiana law).  However, because the Court reserves the right to diverge from the Louisiana Rules, the Louisiana Rules are not the "sole authority" governing motions to disqualify.  *U.S. Fire Ins. Co.,* 50 F.3d at 1312.  A motion to disqualify counsel is "governed by the ethical rules announced by the national profession in light of the public interest and the litigants' rights." *American Airlines,* 972 F.2d at 614; *see also In re Dresser Indus.*, 972 F.2d 540, 543 (5th Cir. 1992) ("The district court's authority to promulgate local rules is derived from 28 U.S.C. § 2071, which allows the courts only to adopt 'rules for the conduct of their business.'  Thus, although the district court should determine rules for the conduct of attorneys for the purpose of identifying conduct subject to sanctions, its local rules alone cannot regulate the parties' rights to counsel of their choice.") (internal citations omitted).

When evaluating Cajun's motion, the Court also considers the American Bar Association's Model Rules of Professional Conduct (the "Model Rules") and the American Bar Association's Model Code of Professional Conduct (the "Model Code").  *See Horaist v. Doctor's Hospital of Opelousas,* 255 F.3d 261, 266 (5th Cir. 2001).  In addition, the Court considers whether an attorney's conflict has the appearance of impropriety or creates a possibility that a specific impropriety will occur, and the Court considers whether "the likelihood of public suspicion from the

impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." *Dresser,* 972 F.2d at 543–44 (citing *Woods v. Covington County Bank,* 537 F.2d 804, 812–13 (5th Cir.1976)).

"Ideally, conflict of interest problems should be settled between the attorney and his client . . . [however,] it is generally proper for an opposing party to bring conflict of interest matters to the attention of the court." *U.S. Fire Ins. Co.,* 50 F.3d at 1315. Indeed, "[a] disqualification inquiry, particularly when instigated by an opponent, presents a palpable risk of unfairly denying a party the counsel of his choosing. Therefore, notwithstanding the fundamental importance of safeguarding popular confidence in the integrity of the legal system, attorney disqualification . . . is a sanction that must not be imposed cavalierly." *Id.* at 1316. *See also Bartech Indus. v. Int'l Baking Co.,* 910 F. Supp. 388, 392 (E.D. Tenn. 1996) (citations omitted) (warning that, in deciding a motion to disqualify, "[c]ourts must also guard against such motions being used to secure a tactical advantage in the proceedings"); *Panduit Corp. v. All States Plastic Mfg. Co.,* 744 F.2d 1564, 1577 (Fed. Cir. 1984) ("motions for attorney disqualification should be reviewed with extreme caution for they can be misused as techniques of harassment"); *Religious Tech. Ctr. v. F.A.C.T.Net, Inc.,* 945 F. Supp. 1470, 1478 (D. Colo. 1996) (same). Even still, under certain circumstances, disqualification may be the Court's only option when faced with a conflict of interest problem. *American Airlines,* 972 F.2d at 614.

Louisiana Rules 1.9 and 1.10 are relevant to this motion. Louisiana Rule 1.9 provides the ethical considerations and professional responsibility rules regarding a

lawyer's duty to a former client.[59]   Louisiana Rule 1.10 imputes a lawyer's disqualification under Rule 1.9 to all the lawyers in the lawyer's law firm.[60]

In the Fifth Circuit, the "substantial relationship" test governs disqualification under Rule 1.9(a) based on a former representation and imputed disqualification under Rule 1.10(a).   In *American Airlines,* the Fifth Circuit summarized the two elements of the substantial relationship test as follows: (1) an actual attorney-client

---

[59] Rule 1.9 of the Rules of Professional Conduct, entitled Duties to Former Clients, provides in pertinent part:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
>
> \*       \*       \*
>
> (c) A lawyer who has formerly represented a client in a matter . . . shall not thereafter:
>> (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
>> (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

Rule 1.9, La. Rules of Prof. Conduct (eff. Mar. 1, 2004).   The pertinent provisions of the Louisiana rule are identical to Rule 1.9 of the ABA's Model Rules.

[60]   Rule 1.10 of the Rules of Professional Conduct, entitled Imputation of Conflicts: General Rule, provides in pertinent part:

> (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

Rule 1.10, La. Rules of Prof. Conduct (eff. Mar. 1, 2004).

relationship between the moving party and the attorney he seeks to disqualify, and (2) a "substantial relationship" between the subject matter of the former and present representations. *American Airlines*, 972 F.2d at 614 (citing *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir. 1989); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1341, 1345 (5th Cir. 1981); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020, 1028 (5th Cir. 1981)). A party seeking to disqualify opposing counsel on the basis of a former representation must establish both elements.

"Inherent in the substantial relationship test is a fundamental concern with protecting the client's interest in the loyalty of his attorney . . . Once it is established that the prior matters are substantially related to the present case, the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation." *Mike Hooks Dredging Co., Inc. v. Eckstein Marine Serv., Inc.,* No. 08–3945, 2010 WL 3081310, at *2 (E.D.La. Aug.5, 2010) (internal citations and quotation marks omitted). The substantial relationship test is "categorical in requiring disqualification once a substantial relationship between past and current representations is established." *American Airlines,* 972 F.2d at 614.

Accordingly, the Court must consider whether the two elements of the substantial relationship test are met in this case. Failure to satisfy either prong is fatal to the motion.

**III.**

14

Cajun moves to disqualify Intellectual Property from representation adverse to it, citing Melasky's relationship with Bader and his family.   Cajun argues that Melasky was in an attorney-client relationship with Bader and his family;[61] "has functioned as the primary intellectual property attorney" for Bader and his bars and restaurants;[62] was trusted and relied on by the Bader family for advice as to strategy and intellectual property;[63] and that, consequently, Melasky should be disqualified from undertaking representation adverse to Bader and the Bader family.[64]   The

---

[61] *See, e.g.,* R. Doc. No. 16, at 1.

[62] *Id.*

[63] *Id.* at 3–4.

[64] R. Doc. No. 16-1, at 8.  In support of its motion to disqualify Intellectual Property, Cajun submitted an expert opinion, authored by Leslie J. Schiff, a "Louisiana ethics specialist," who opined that Intellectual Property's engaging in representation adverse to Cajun reflects a conflict of interest.  Sempiterno argues that the Court should not consider the opinion because it offers an ultimate conclusion of law, regarding the ultimate legal issue of whether this lawsuit is substantially related to Melasky's prior representation. R. Doc. No. 23, at 12.  Cajun counters that the opinion bears on a factual inquiry.  R. Doc. No. 28-2, at 10.

The Court agrees with Sempiterno that Schiff impermissibly attests to an ultimate legal conclusion. "While an expert opinion is not objectionable simply because it embraces an ultimate issue, 'an expert is not permitted to offer legal conclusions.'" *Franklin v. Regions Bank*, No. 16-1152, 2018 WL 3212053, at *10 (W.D. La. Apr. 18, 2018), *aff'd*, No. 16-1152, 2018 WL 2449208 (W.D. La. May 31, 2018) (citing *McBroom v. Payne*, 478 Fed. Appx. 196, 200 (5th Cir. 2012)).   "Whether or not an attorney violated a rule of professional conduct constitutes a legal conclusion." *Id*. (citing *In re Hollis*, 177 So. 3d 110, 114 (La. 2015)); *see also American Airlines*, 972 F.2d at 609 ("a district court's interpretation of the state disciplinary rules is an interpretation of law[.]").   Therefore, the Court will not consider Schiff's expert opinion.  *See, e.g., Wiener, Weiss & Madison v. Fox*, No. 16-0850, 2018 WL 1404286, at *7 (W.D. La. Mar. 20, 2018) (declining to consider expert opinions in the field of legal ethics); *see also Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009) ("[A]n expert may never render conclusions of law.") (citing *Snap–Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir.1996)).

attorney-client relationship, Cajun contends, began in 2012 but might be characterized as "on 'stand by'" through at least 2019.[65]

Sempiterno counters that "there was no actual attorney-client relationship" between Cajun and Melasky and, therefore, no attorney-client relationship that implicates Intellectual Property.[66]  Sempiterno concedes that Melasky "previously represented other businesses owned by Cajun 417 member Morton Bader and his family in unrelated trademark matters,"[67] but asserts that the representation was not of Bader or the Bader family themselves, but rather of companies they owned, and that in either case, Melasky's client was not Cajun, the moving party in the instant suit.[68]  Therefore, Sempiterno argues, because Melasky never represented Cajun—a company that, as Sempiterno notes, did not exist until five years after Sempiterno maintains Melasky's representation of the Bader family's other corporate entities had concluded[69]—there is no prior attorney-client relationship to which Intellectual Property's representation could be adverse.[70]  Additionally, Sempiterno casts the relationship between Melasky and Bader in a different light from Cajun, describing it as "brief," running the sixteen months from October 2012 until February

---

[65] R. Doc. No. 28-2, at 5–6.
[66] R. Doc. No. 23, at 2.
[67] *Id*. at 4.
[68] *See id*. ("Mr. Melasky represented businesses owned by Mr. Bader and his family[.]"); *id*. at 5 ("Mr. Bader, however, does not identify any matters in which Mr. Melasky represented Cajun 417.  Nor does he identify any matters in which Mr. Melasky represented 'the Bader family' in connection with the actual use of 'House of the Rising Sun' as a trademark.").
[69] *Id*. at 2.
[70] *Id*. at 8–9.

16

2014.[71]   Finally, Sempiterno asserts that Bader's allegation that he and Melasky discussed House of the Rising Sun—a name now affiliated with Cajun—is "too logically tenuous" a connection to establish an attorney-client relationship between Cajun and Melasky.[72]

Courts in Louisiana apply the Restatement (Third) of the Law Governing Lawyers to determine if an actual attorney-client relationship exists.  *Zichichi v. Jefferson Ambulatory Surgery Center*, No. 07-27774, 2008 WL 2859232 at *3 (E.D.La. July 22, 2008) (Vance, J.) (*citing In re Austin*, 943 So.2d 341 (La. 2006)).  According to the Restatement, a relationship of client and lawyer arises when:

> (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either
> a. the lawyer manifests to the person consent to do so; or
> b. the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services; or
> (2) a tribunal with the power to do so appoints the lawyer to provide the services.

Restatement (Third) of Law Governing Lawyers § 14 (2000).  In examining whether a lawyer manifests his consent to provide legal services to a person, courts give "great deference to the client's subjective belief whether an attorney-client relationship exists."  *In re Austin*, 943 So.2d at 348.  However, "the overarching question is whether there is a reasonable, objective basis to determine that an attorney-client relationship has formed."  *Id.*

Where the client is an organization, the Restatement explains:

---

[71] *Id.* at 1.
[72] *Id.* at 10.

> A lawyer who has been employed or retained to represent an organization as a client owes professional duties of loyalty and competence to the organization. By representing the organization, a lawyer does not thereby also form a client-lawyer relationship with all or any individuals employed by it or who direct its operations or who have an ownership or other beneficial interest in it, such as its shareholders. However additional circumstances may result in a client-lawyer relationship with constituents while the lawyer concurrently represents the organization.

Restatement (Third) of the Law Governing Lawyers § 96 (2000); *see also id.* (including "[a] shareholder of a stock corporation or a member of a membership corporation" within the definition of constituent).

The Restatement describes "additional circumstances" that might lead to an attorney-client relationship with an organization's constituents.[73] A lawyer "does not enter into a client-lawyer relationship with a person associated with an organizational client solely because the person communicates with the lawyer on matters relevant to the organization that are also relevant to the personal situation of the person." Restatement § 14 (2000). Rather, "[i]n all events, the question is one of fact based on the reasonable and apparent expectations of the person or entity whose status as client is in question." *Id.* (noting that "[a]n implication that such a relationship exists is more likely to be found when the lawyer performs personal legal services for an individual as well or where the organization is small and characterized by extensive common ownership and management.").

---

[73] The Restatement allows for such representation. *See* Restatement § 96(h) (2000) ("Subject to conflict-of-interest considerations . . . a lawyer representing a client organization may also represent one or more constituents of the organization . . . .").

Ultimately, it is the lawyer's responsibility to clarify whether there is an attorney-client relationship.  *See* Restatement § 14 (". . . a lawyer's failure to clarify whom the lawyer represents in circumstances calling for such a result might lead a lawyer to have entered into client-lawyer representations not intended by the lawyer. . .  Hence, the lawyer must clarify whom the lawyer intends to represent when the lawyer knows or reasonably should know that, contrary to the lawyer's own intention, a person, individually, or agents of an entity, on behalf of the entity, reasonably rely on the lawyer to provide legal services to that person or entity. . . .").

It is undisputed that Melaksy entered into an attorney-client relationship with corporate entities that were owned and primarily operated by Bader and the Bader family.[74]  The disputed question over which the parties are divided is whether that prior representation was of the Baders themselves or the Bader's other companies— and in either case, whether that attorney-client relationship extends to encompass the since-formed entity, Cajun.  The Court finds that an attorney-client relationship was formed between Melasky and Bader, but that the attorney-client relationship does not reach Cajun.

Under the Restatement § 14, although the fact that Bader communicated with Melasky on behalf of the organizations would not suffice to establish a relationship, Bader and his family's reasonable expectations that they were also clients of Melaksy does.  The Restatement is clear that an implication of a lawyer-client relationship "is

---

[74] Both parties also agree that Intellectual Property never represented Cajun 417. *See* R. Doc No. 23, at 9.

more likely to be found . . . where the organization is small and characterized by extensive common ownership and management," as the Baders' organizations were, and the Restatement still places the onus on the lawyer to "clarify" the bounds of the representation.  Absent any indication that Melaksy clarified to Bader and the Bader family that his representation was only of the organizations and not Bader or his family themselves, the Court cannot state that the Bader family was unreasonable in apparently expecting that they, too, were clients of Melasky.

Indeed, failing to recognize an attorney-client relationship between Melasky and Bader and the Bader family would be contrary to the standard that the existence and extent of an attorney-client relationship "turns largely on the client's subjective belief that it exists." *See, e.g., In re Austin*, 943 So.2d at 345; *Watson v. Franklin*, 198 So.3d 177, 180 (La. Ct. App. 2d Cir. 2016) (citing *Louisiana State Bar Ass'n v. Bosworth*, 481 So.2d 567, 571 (La.1986)).  Bader and the Bader family apparently believed that the attorney-client relationship existed.[75]  The Court therefore finds that the attorney-client relationship was not confined to the organizations and reached Bader and his family.

However, though the Court finds that Melasky did represent Bader and the Bader family, and that he was in an attorney-client relationship with them, the Court does not find that Melasky was in an attorney-client relationship with Cajun.  Cajun does not contend that they were ever represented by Melasky; rather, Cajun relies on the assertion that a relationship existed between the Baders and Melaksy to claim

---

[75] R. Doc. No. 28-2, at 1.

that Melasky also represented it.  A relationship between Bader and Melasky, however extensive, cannot be equated to a relationship between Cajun and Melasky. Bader and Cajun are not interchangeable.  And while § 14 contemplates that an attorney-client relationship might form between an attorney and individuals consequent to the attorney's work with an organization, particularly where it is small, there is no inference under the rule that such a relationship forms with an organization consequent to an attorney's relationship with individuals.  The Baders cannot have comprehended such a relationship years before Cajun existed.[76]

It is the moving party's burden to establish that an attorney-client relationship existed between it and the attorney with the alleged conflict.  Cajun is the moving party, not Bader or his family members, and Cajun has failed to make that demonstration.  The Court, therefore, finds an attorney-client relationship did not exist between Melasky and the moving party.  Thus, Cajun's motion fails.

Because both prongs of the inquiry must be met, the Court will not proceed to the second—whether there was a substantial relationship between matters.  Nor will the Court consider the irrebuttable presumptions relevant if a substantial relationship has been established.

## V.

---

[76] Cajun was formed after Melasky asserts that his representation was complete, in 2014.  Even if, as Cajun avers, Melasky's representation of the Baders continued through 2019, that would make no difference, because the Baders and Cajun are distinct for purposes of representation, and nothing but the Baders links Melasky to Cajun.

Accordingly,

**IT IS ORDERED** that Cajun 417, LLC's motion to disqualify Intellectual Property as counsel for Sempiterno is **DENIED**.

**IT IS FURTHER ORDERED** that Cajun 417, LLC's motion to continue Sempiterno's motion for a preliminary injunction as well as the joint motion for expedited consideration of said motion to continue are **DISMISSED AS MOOT**.[77]

**IT IS FURTHER ORDERED** that Sempiterno's motion[78] for a preliminary injunction shall be consolidated with the trial on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** that Sempiterno's motion for an extension of time to answer is **GRANTED**.  Sempiterno shall respond to Cajun's answer and counterclaims no later than **SEPTEMBER 8, 2020**.

**IT IS FURTHER ORDERED** that the scheduling conference with this Court's courtroom deputy remains scheduled for **SEPTEMBER 15, 2020** at **9:00 A.M.**

New Orleans, Louisiana, August 25, 2020.

_____
**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**

---

[77] The motions were set for submission on July 22, 2020.  That date lapsed while motions were stayed pending resolution of the motion to disqualify.
[78] R. Doc. No. 13.